IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

*Plaintiff*,

v.

TYRON HARRISON,

*Defendant*.

Criminal No. 2:23-cr-129 - 23

Hon. William S. Stickman IV

## MEMORANDUM OPINION

WILLIAM S. STICKMAN IV, United States District Judge

By Indictment filed on June 20, 2023, Defendant Tyron Harrison ("Harrison"), was

charged as follows at Count Eight, in violation of 18 U.S.C. § 922(g)(1):

> On or about May 23, 2023, in the Western District of Pennsylvania, the
> defendant, TYRON HARRISON, knowing he had previously been convicted of a
> crime punishable by imprisonment for a term exceeding one year, namely:
> Possession of a firearm by a convicted felon, on or about December 19, 2016, at
> Docket Number 02:16-149, in the United States District Court, Western District
> of Pennsylvania; Firearms not to be carried without a license, on or about May 7,
> 2012, at Docket Number CP-02-CR-15341-2011, in the Court of Common Pleas,
> County of Allegheny, Criminal Division, Commonwealth of Pennsylvania;
> Firearms not to be carried without a license, on or about April 4, 2018, at Docket
> Number CP-02-CR-9234-2017, in the Court of Common Pleas, County of
> Allegheny, Criminal Division, Commonwealth of Pennsylvania, knowingly
> possessed, in and affecting interstate commerce, a firearm and ammunition, to
> wit: a Bersa BP9cc 9 mm pistol, bearing serial number J14024, and Luger
> ammunition.

(ECF No. 53, p. 12). The Government has represented as to Harrison's prior conviction:

> Harrison was arrested on November 17, 2011, and charged with Receiving Stolen
> Property, and Firearms Not to be Carried without a License, both felony offenses.
> On that occasion, Pittsburgh Police observed the defendant clutching an item in
> his left jacket sleeve. When Harrison got closer to the defendant, they observed
> the barrel of a gun sticking out from his sleeve. The firearm was recovered and
> was discovered to have been stolen in 2004. The defendant plead guilty to both

1

charges and on May 7, 2012, was sentenced to nine to eighteen months incarceration.

While on probation supervision for that conviction, Harrison was arrested for illegal possession of another firearm. On January 21, 2016, Pittsburgh Police were working an undercover detail in response to a homicide in Zone 6. They initiated a traffic stop and the defendant was the front seat passenger of the vehicle. During the stop, officers observed a firearm in the front pocket of the defendant's hooded sweatshirt. Harrison was arrested and police removed a 9mm Ruger pistol, which was loaded and chambered, from his front pocket. Harrison was charged with possession of a firearm by a convicted felon, in violation of 18 U.S.C. §922(g), and was sentenced to 15 months imprisonment followed by two years' supervised release. Harrison violated his supervised release and was sentenced on November 1, 2018, to twelve months and one day imprisonment, followed by 24 months' supervised release. He again violated his supervised release and on February 4, 2022, was sentenced to time served with no further supervision.

On May 2, 2017, Harrison was the passenger vehicle that fled a traffic stop. The driver crashed the vehicle and ran from the scene. The defendant opened the passenger door of the car and was taken into custody. A firearm was recovered from the floor at Harrison's feet. The defendant pled guilty to Firearms Not To Be Carried Without a License, a third degree felony, and was sentenced to 321 days' incarceration.

On May 11, 2022, Pittsburgh Police responded to a ShotSpotter activation on the 2100 block of Fifth Avenue. They observed the defendant in a nearby passenger seat of a vehicle. The defendant and the driver of the vehicle quickly left the vehicle after observing a large law enforcement presence. Officers obtained a search warrant for the vehicle and directly under the seat the defendant was seated in was a loaded black Glock 9mm pistol with a laser attachment. Harrison was charged with Firearms Not To Be Carried Without a License, a felony of the third degree, and Person Not To Possess a Firearm, a felony of the first degree. He was arrested on September 8, 2022, and placed on pretrial supervision.

Harrison was arrested in September 2022, and charged with Firearms Not to Be Carried Without a License, a third degree felony, Receiving Stolen Property, a second degree felony, Feeling or Attempting to Elude Officers, a third degree felony, and other misdemeanor and summary offenses, from an offense which occurred on May 30, 2021. Harrison was observed on the 2100 block of Watson Street with a black firearm with an extended magazine. Police attempted to stop him and he fled in a vehicle. During the defendant's flight, he wrecked into an occupied vehicle, made an illegal u-turn, almost hitting a police officer, and almost hit a Secret Service Agent with his vehicle, in an attempt to get away from law enforcement. He was arrested after a foot pursuit and a bag with 9 live rounds was recovered. Police recovered a stolen Taurus PT111 G2 firearm with an extended magazine loaded 21 live rounds on the floor of the vehicle Harrison was driving. After his arrest, he was placed on pretrial supervision.

(ECF No. 462, pp. 2-4).  Harrison has filed a Motion to Dismiss Indictment in the wake of *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) arguing that § 922(g)(1) is unconstitutional as applied to him and on its face as well as unconstitutionally vague and in violation of the Commerce Clause.  (ECF No. 377).  The Government opposes the motion.  For the following reasons, the Court will deny Harrison's motion.

## I.      STANDARD OF REVIEW

The Federal Rules of Criminal Procedure require that an indictment be a plain, concise and definite written statement of the essential facts constituting the offense charged.  Fed. R. Crim. P. 7(c)(1).  An indictment is sufficient if it includes the elements of the offense intended to be charged, apprises the defendant of what he must be prepared to defend against at trial, and enables him to plead a former acquittal or conviction in the event of a subsequent prosecution. *United States v. Rawlins*, 606 F.3d 73, 78-79 (3d Cir. 2010); *United States v. Vitillo*, 490 F.3d 314, 321 (3d Cir. 2007).  An indictment that fails to charge all elements of a crime must be dismissed.  *United States v. Cochran*, 17 F.3d 56, 57 (3d Cir. 1994).

A motion to dismiss an indictment is governed by Rule 12 of the Federal Rules of Criminal Procedure ("Rule 12"), which states: "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(1).

> [T]he scope of a district court's review at the Rule 12 stage is limited.  "[A] pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence." *United States v. DeLaurentis*, 230 F.3d 659, 660 (3d Cir. 2000) (citations omitted).  "The government is entitled to marshal and present its evidence at trial, and have its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29." *Id.* at 661.  There is no criminal corollary to the civil summary judgment mechanism. *Id.*  In evaluating a Rule 12 motion to dismiss, a district court must accept as true the factual allegations set forth in the indictment. *United States v. Sampson*, 371 U.S. 75, 78–79, 83 S.Ct. 173, 9 L.Ed.2d 136

> (1962); *United States v. Besmajian*, 910 F.2d 1153, 1154 (3d Cir. 1990).
> "Evidentiary questions—such as credibility determinations and the weighing of
> proof—should not be determined at this stage." *Bergrin*, 650 F.3d at 265 (internal
> marks and citation omitted). Thus, a district court's review of the facts set forth
> in the indictment is limited to determining whether, assuming all of those facts as
> true, a jury could find that the defendant committed the offense for which he was
> charged. *Panarella*, 277 F.3d at 685; *DeLaurentis*, 230 F.3d at 660.

*United States v. Huet*, 665 F.3d 588, 595-96 (3d Cir. 2012), *abrogated on other grounds*. Under

Rule 12, the Court can dismiss criminal charges in an indictment where there is an infirmity of

law in the prosecution, such as an unconstitutional statute.

## II.    ANALYSIS

### A. 18 U.S.C. § 922(g)(1) is constitutional on its face and as applied to Harrison.

Harrison contends that recent developments in Second Amendment jurisprudence require

the Court declare 18 U.S.C. § 922(g)(1) unconstitutional. The Court disagrees; it will not declare

§ 922(g)(1) unconstitutional on its face or as applied to Harrison.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the

security of a free State, the right of people to keep and bear Arms, shall not be infringed." U.S.

Const. amend. II.    In 2008, the Supreme Court held that, "on the basis of both text and history,"

the Second Amendment protects *an individual's* right to keep and bear arms. *District of*

*Columbia v. Heller*, 554 U.S. 570, 595 (2008). The Supreme Court made clear, however, that

"[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626.

Relevant to the instant motion, the Supreme Court stated:

> Although we do not undertake an exhaustive historical analysis today of the full
> scope of the Second Amendment, nothing in our opinion should be taken to cast
> doubt on longstanding prohibitions on the possession of firearms by felons and
> the mentally ill, or laws forbidding the carrying of firearms in sensitive places
> such as schools and government buildings, or laws imposing conditions and
> qualifications on the commercial sale of arms.

*Id.* at 625-27.  It further noted that "these presumptively lawful regulatory measures" were only examples and not an exhaustive list.  *Id.* at 627 n.26.  "[T]here will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us."  *Id.* at 635.

In June 2010, the Supreme Court held that the Second Amendment right, elucidated in *Heller*, is incorporated against the states.  *See McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010).  More specifically, it held that the "the right to keep and bear arms for the purpose of self-defense" in the home recognized by the Second Amendment "is fully applicable to the states."  *Id.*  The Supreme Court reiterated its observations in *Heller*, 554 U.S. at 626, that the right protected by the Second Amendment (like the rights protected elsewhere in the Constitution) is not unlimited and stated plainly: "We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' We repeat those assurances here." *McDonald*, 561 U.S. at 786 (quoting *Heller*, 544 U.S. at 626-27).  "[I]ncorporation does not imperil every law regulating firearms."  *Id.*

In 2022, the Supreme Court articulated an approach to addressing challenges invoking the Second Amendment in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. ——, 142 S. Ct. 2111 (2022).  It rejected the kinds of tests developed by the courts of appeal which employed a "means-end" scrutiny.  *Id.* at 2126–27.  In their place, the Supreme Court articulated a new test:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that

5

conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'

*Id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10 (1961)). *Bruen* does not explicitly address the propriety of firearm possession bans for persons previously convicted of a felony crime; however, it refers to those falling under the protection of the Second Amendment as "law abiding" people. Thus, *Bruen* does not upset the Supreme Court's consistent endorsement of felon disarmament. The Supreme Court explicitly stated that it is "[i]n keeping with *Heller*." *Id.*

Since then, the United States Court of Appeals for the Third Circuit directly applied *Bruen* in *Range v. Attorney General United States of America*, 69 F.4th 96 (3d Cir. 2023) (*en banc*). The Third Circuit evaluated an as-applied challenge under *Bruen* to the prohibition on felons possessing guns in § 922(g)(1). Range pleaded guilty in 1995 to making a false statement to obtain food stamps. *Id.* at 98. At the time he pleaded guilty, his conviction was considered a misdemeanor punishable by up to five years' imprisonment. *Id.* But his conviction precluded him from possessing a firearm under § 922(g)(1). *Id.* To reemphasize – Range was not a felon; he committed a nonviolent misdemeanor offense relating to false statements on paperwork for public benefits. Range wanted to possess a hunting rifle and a shotgun for home defense, so he sought a declaration that § 922(g)(1) violates the Second Amendment as applied to him. *Id.* at 99.

The Third Circuit applied the *Bruen* analysis and ruled in Range's favor. After determining that Range was one of "the people" to whom the Second Amendment applies, and his proposed conduct (owning a hunting rifle) was protected by the Second Amendment, the

Third Circuit then asked whether the government carried its burden to justify stripping Range of that right. In order to justify § 922(g)(1), as it applied to Range, the government needed to show that the statute was "consistent with the Nation's historical tradition of firearm regulation." *Id.* (quoting *Bruen*, 142 S. Ct. at 2130). Ultimately, the Third Circuit determined that the government had not met its burden because a review of sources from the founding era and early Republic do not reveal that the disarmament of people like Range was practiced or contemplated. Rather, a review of those sources demonstrated that at the time of the ratification of the Second Amendment, disarmament was limited to individuals who were viewed as dangerous to the community. *Id.* at 103–04. In other words, the Third Circuit held that the government failed to show that the historical tradition of firearms regulation would have deprived Range of his Second Amendment right to possess a firearm in light of his conviction for making false statements on an application for public benefits. *Id.* at 106.

Notably, the Third Circuit emphasized that its decision in *Range* "is a narrow one." *Id.* at 106. It did not invalidate § 922(g)(1). As Judge Ambro stated in a concurrence joined by two other judges, § 922(g)(1) "remains. . . because it fits within our Nation's history and tradition of disarming those persons who legislature believe would, if armed, pose a threat to the orderly functioning of society." *Id.* at 110 (citations omitted).

As to Harrison's facial challenge to § 922(g)(1), *Bruen* does not upset the Supreme Court's consistent endorsement of felon disarmament.[1] The distinction drawn by the majority opinion in *Range* between violent and nonviolent felons does not help Harrison. In *Range*, the

---

[1] The Court does not consider extensive historical discussion essential to resolving Harrison's argument that § 922(g)(1) is unconstitutional under *Bruen*. There is overwhelming precedent upholding the constitutionality of restrictions on the possession of firearms by felons and there is no need for the Court to conduct an in-depth analysis of whether the felon-in-possession statute is consistent with the historical tradition of firearm regulation.

Third Circuit did not hold that § 922(g)(1) is unconstitutional in all circumstances, as necessary to succeed in a facial challenge. *See United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011) (*en banc*) (citation omitted) ("A party asserting a facial challenge 'must establish that no set of circumstances exists under which the Act would be valid.'"). In fact, the majority opinion recognized that the statute is constitutional when applied to violent felons. *Range*, 69 F.4th at 104. The Third Circuit, in *Range*, did not find § 922(g)(1) facially unconstitutional. Here, Harrison has not demonstrated that § 922(g)(1) violates the Second Amendment in all applications. Harrison's facial challenge fails.

As to Harrison's "as applied" challenge, it too fails. Applying the *Bruen* framework to this case, the threshold question is whether Harrison is one of "the people" protected by the Second Amendment despite having prior felony convictions. *Range*, 69 F.4th at 101. In *Range*, the Third Circuit majority held that "the people" in the constitutional text refers to all Americans and not only law-abiding persons. *Id.* The Third Circuit agreed with a statement of then-Judge Amy Coney Barrett that "'all people have the right to keep and bear arms,' though the legislature may constitutionally 'strip certain groups of that right.'" *Id.* at 102 (quoting *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting)). Accordingly, as the Government concedes (ECF No. 462, p. 7), Harrison is one of "the people" protected by the Second Amendment.

Having determined that Harrison is one of "the people," the next question is whether "'the Second Amendment's plain text covers [Harrison's] conduct,' and 'the Constitution presumptively protects that conduct.'" *Range*, 69 F.4th at 103 (quoting *Bruen*, 142 S. Ct. at 2126). Harrison, unlike Range, was in possession of a <u>stolen</u> firearm while on state pretrial supervision. A stolen firearm is not typically possessed by law-abiding citizens for lawful

purposes. Furthermore, Harrison, unlike Range, is a person who continually chooses to illegally possesses firearms. He has two state court third-degree felony convictions for Carrying a Firearm without a License (18 Pa. C.S. § 6101). Notably, while on probation supervision for the first conviction, Harrison was arrested for illegally possessing another firearm, and subsequently convicted in federal court of Possession of a Firearm by a Convicted Felon (18 U.S.C. § 922(g)). Then, while on pretrial supervision for state firearms charges (Firearms Not To Be Carried Without a License and Person Not To Possess a Firearm) arising from a May 11, 2022 incident, Harrison was involved in a May 30, 2021 incident where he fled from the police with a firearm with an extended magazine and charged with Firearms Not to Be Carried Without a License, Receiving Stolen Property, Fleeing or Attempting to Elude Officers, and other misdemeanor and summary offenses. The Government has accurately and thoroughly outlined the details of Harrison's extensive criminal history, including his firearms violations, and pending state charges on pages two through four of its response to Harrison's motion. (ECF No. 462, pp. 3-4). Harrison's criminal history and recent arrests demonstrate a propensity toward illegally possessing firearms. It also shows a willingness to engage in conduct reasonably likely to cause danger to life and limb and general mayhem—such as one of his more recent arrests for fleeing and eluding law enforcement. Harrison's background demonstrates that he poses a danger to society.

While, as *Range* observed, there is no historical tradition from the colonial era or early Republic categorically disarming those merely convicted of crimes (particularly, crimes relating to the sort of conduct that Range committed), there is a long history of disarming people who pose a danger to society. As early as the seventh century, English law permitted the disarmament of violent and dangerous people. Joseph G.S. Greenlee, *The Historical*

9

*Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 258 (2020) (citing Ancient Laws and Institutes of England 3 (Benjamin Thorpe ed., 1840) (describing the Laws of King Aethelbirht as banning the provision of arms to another "where there is strife"). A millennium later, in the seventeenth century, King Charles II ordered the Lord Mayor of London to disarm "dangerous and disaffected persons." *Id.* at 259 (citing 10 Calendar of State Papers, Domestic Series, Domestic Series of the Reign of Charles II, 1660-1670 237 (1895)). This included Catholics who, following the failed gunpowder plot, were viewed as disloyal and potentially dangerous. *Id.* at 258 (citing 1 Stuart Royal Proclamations: Royal Proclamations of King James I 1603-1625, 247-48 (June 2, 1610) (James F. Larkin & Paul I. Hughes eds., 1973)).

Colonial laws mirrored English models and similarly disarmed those persons viewed as a danger to public order, including American Indians, Catholics, Quakers, slaves, and freed Black people. There is no question that such laws imposing discriminatory class-wide disarmament would, thankfully, fail constitutional scrutiny under modern standards. Nevertheless, they demonstrate that at the time of the founding, the American colonists were accustomed to laws depriving people posing a threat to society (as they viewed it) from possessing arms. Colonial laws also disarmed those whose actions made them a danger to the community. Laws passed in Massachusetts Bay and New Hampshire forbade the carrying of arms "in an aggressive and terrifying manner." *Id.* at 262. Likewise, Virginia allowed the disarmament of those "who ride, or go, offensively armed, in Terror of the People." *Id.* at 262 (citing George Webb, The Office of Authority of a Justice of the Peace 92-93 (1736)).

At the time of the ratification of the Second Amendment, alongside the several states' declarations of rights, the framers and the people understood that the right to keep and bear arms

extended to all "peaceable" citizens.  Wyoming LR at 266 (citing 2 BERNARD SCHWARTZ, THE
BILL OF RIGHTS: A DOCUMENTARY HISTORY 675 (1971)); *see also* Stephen Halbrook, THAT
EVERY MAN BE ARMED 86 (revised ed. 2013) ("[T]he Second Amendment…originated in part
from Samuel Adams's proposal…that Congress could not disarm any peaceable citizens.").
Samuel Johnson's dictionary from the time of ratification defined "peaceable" as "1.  Free from
war; free from tumult. 2. Quiet; undisturbed; 3. Not violent; not bloody; 4. Not quarrelsome; not
turbulent." 2 Samuel Johnson, A DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 1773).[2]  The
prevailing view that "peaceable" citizens were secure in their right to keep and bear arms
excluded those who did not fall within that definition—those who were, conversely, dangerous.
As Third Circuit Judge Thomas M. Hardiman's concurring opinion in *Binderup v. Att'y Gen.
United States of America*, 836 F.3d 336, 368 (3d Cir. 2016) observed:

> [T]he debates from the Pennsylvania, Massachusetts and New Hampshire
> ratifying conventions, which were considered "highly influential" by the
> Supreme Court in *Heller*…confirm that the common law right to keep and bear
> arms did not extend to those who were likely to commit violent offenses.  Hence
> the best evidence we have indicates that the right to keep and bear arms was
> understood to exclude those who presented a danger to the public.

(internal citations omitted).

The disarming of people who pose a danger to society is deeply rooted in our country's
legal traditions.  While it is easy to categorize violent felons as dangerous, that label is not
limited to people with a history of violent criminal conduct.  The Court holds that, as historically
understood, felons whose conviction(s) is/are related to illegal possession of stolen firearms are
dangerous.  Historic analogues and modern jurisprudence recognize that such individuals pose a
clear and present danger to our communities.  Modern laws prohibiting them from possessing

---

[2]   Johnson's dictionary is an authoritative resource for the meaning of words as understood by
the founding generation.  The Supreme Court cited to it in *Heller* to interpret the language of the
Second Amendment. *See Heller*, 554 U.S. at 582-84.

firearms align with the nation's historical tradition of firearm regulation.   The goal of these regulations is to protect the public (law-abiding citizens) from disorder and violence.   The danger of permitting felons to illegally possess stolen firearms is obvious.   "The right to keep and bear arms always has been subject to careful limitations," which "are at their zenith when applied to people who are the antithesis of the law-abiding citizen who wants to exercise his or her right to self-defense, whether at home or in public, and who may also enjoy the various sports and other activities that involve guns." *Atkinson v. Garland*, 70 F.4th 1018, 1037 (7th Cir. 2023) (Wood, J., dissenting).

Holding § 922(g)(1) unconstitutional as applied to a defendant like Harrison would strip Congress of its ability to protect the public from a clear and present danger.   This is not something that the Court is willing to condone.   Harrison's background shows that he poses a danger to society.   It is consistent with the Supreme Court's observation in *Heller* and its progeny, as well as historical tradition, to deprive Harrison of his right to possess a firearm.   The prohibition on firearm possession by felons under § 922(g)(1) does not violate the Second Amendment, particularly as applied to Harrison.

**B.   18 U.S.C. § 922(g)(1) is not unconstitutionally vague.**

Harrison cannot mount a facial vagueness challenge to § 922(g)(1) without showing the statue is unconstitutional as applied to him, which he have failed to do.   Nevertheless, the Court holds that § 922(g)(1) is not unconstitutionally vague.

There is a strong presumption that lawfully enacted statutes are valid. *I.N.S. v. Chadha*, 462 U.S. 919, 944 (1983). "The void-for-vagueness doctrine reflects the fundamental principle that, in order to comply with the requirements of due process, a statute must give fair warning of the conduct that it prohibits." *United States. v. Portanova*, 961 F.3d 252, 262–63 (3d Cir. 2020) (quoting *United States v. Fontaine*, 697 F.3d 221, 226 (3d Cir. 2012)).   "A statute is

unconstitutionally vague under the Due Process Clause if it (1) fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits; or (2) authorizes or even encourages arbitrary and discriminatory enforcement." *Fontaine*, 697 F.3d at 226 (internal quotation marks omitted) (citation omitted); *accord Johnson v. United States*, 576 U.S. 591, 595 (2015); *see also United States v. Williams*, 553 U.S. 285, 304 (2008) (citation omitted) (noting that a criminal statute is unconstitutionally vague, and in violation of the Due Process Clause, if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.").

In § 922(g)(1), Congress makes it unlawful for "any person—(1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year; ... to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(1). Harrison can easily determine whether he is covered by this statute by examining his prior criminal convictions, and the statutory maximum prison terms for the crimes of conviction. To convict Harrison, the Government must prove four elements: (1) Harrison was a felon; (2) Harrison knew he was a felon; (3) Harrison knowingly possessed a firearm or ammunition; and (4) the firearm or ammunition was in or affecting interstate commerce. Section 922(g) requires proof that Harrison "knew he belonged to the relevant category of persons barred from possessing a firearm," *Rehaif v. United States*, 139 S. Ct. 2191, 2200 (2019), and "the knowledge requirement of the statute further reduces any potential for vagueness." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 21 (2010). For

these reasons, the Court holds that § 922(g)(1) does not fail to provide "fair notice of what is prohibited," and is not unconstitutionally vague.

### C.  18 U.S.C. § 922(g)(1) does not violate the Commerce Clause.

In his last argument, Harrison contends that § 922(g)(1) exceeds the power of the federal government under the Commerce Clause.  He concedes that he is advancing this argument only to preserve it for future review.  This is because Harrison's argument is foreclosed by well-established precedent.  The Commerce Clause authorizes Congress to regulate "the channels of interstate commerce, persons or things in interstate commerce, and those activities that substantially affect interstate commerce." *Nat. Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012) (internal quotation marks omitted) (quoting *United States v. Morrison*, 529 U.S. 598, 609 (2000)).  The problem addressed by § 922(g)(1) is the possession of firearms in interstate commerce by particular "channels of commerce"—those channels under the language of § 922(g)(1) being individuals with certain criminal convictions.  The Supreme Court, in *Bruen*, did not overrule its decisions upholding Congress's power to regulate the possession of firearms in interstate commerce.  *See Bruen*, 142 S. Ct. at 2162).  The Third Circuit has affirmed that § 922(g)(1) was a proper exercise of Congress's regulatory power under the Commerce Clause. *See United States v. Singletary*, 268 F.3d 196, 204 (3d Cir. 2001); *United States v. Shambry*, 392 F.3d 631, 634 (3d Cir. 2004); *United States v. Gateward*, 84 F.3d 670, 672 (3d Cir. 1996); *see also Range*, 69 F.4th at 103-04.

14

### III.   Conclusion

For the foregoing reasons, Harrison's Motion to Dismiss Indictment will be denied.  An

Order of Court will follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

10-13-2023
Date